# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| ANDRA KUHL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 4:12-CV-00091-NKL |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Plaintiff Andra Kuhl's Social Security Complaint [Doc. # 3]. For the following reasons, the Court reverses the decision of the Administrative Law Judge ("ALJ").

## I.  Background

This case involves a claim for Disability Insurance benefits under Title II of the Social Security Act., 42 U.S.C., §§ 410 *et seq*.; 42 U.S.C. §§ 1382, *et seq*. Plaintiff Kuhl contests the findings that she is not disabled.

Andra Kuhl was granted disability benefits effective March 29, 2000, after she was involved in an automobile accident. The ALJ at that time found that Kuhl suffered from severe back pain and chronic migraines, and that as a result of her pain she could not perform even sedentary work in a competitive setting. On March 15, 2006, the state agency determined that Kuhl's period of disability had ceased due to medical

1

improvement. Kuhl filed a timely request for a hearing on August 28, 2006, and a hearing was held in Kansas City, Missouri, on March 18, 2009. After the hearing, the ALJ determined that Kuhl had medically improved and affirmed the termination of her disability benefits. Kuhl appealed the ALJ's decision to the Social Security Appeals Council, which denied her request for review on March 31, 2011. On November 18, 2011, the Appeals Council reversed its earlier denial, considered additional information, and again denied review.

### A. The ALJ's Decision

The ALJ determined that Kuhl's period of disability ceased as of March 15, 2006, due to improvement. He also found Kuhl's impairments to be "severe," but not so severe as to "meet or equal any criteria contained in the Listing of Impairments." While he found that Kuhl was not capable of her past relevant work, he found she was able to perform light, unskilled work. He relied primarily on her failure to seek regular treatment, and a failure to take pain medication, to conclude that her pain was exaggerated. The ALJ also relied on her ability to perform daily life activities to support his finding that she was not disabled.

Finally, he concluded that the testimony of her treating health care providers was not supported by objective medical evidence.

### B. Opinion of Dr. Brahms

The ALJ relied on the opinion of a medical examiner, Dr. Malcolm Brahms, who testified via telephone at Kuhl's hearing but did not examine Kuhl in person. Dr. Brahms stated that after reviewing the record, he concluded that "Ms. Kuhl is a very obese

diabetic individual who has had some problems with her thyroid gland" and that "she has some degenerative changes consistent with a person of this large body structure." He furthermore stated that she has "a rheumotological diagnosis of impending scleroderma" but that whether or not she "has a rheumatoid arthritic Reynaud's Phenomenon diagnosis [sic]… is not yet completely opinionated." He mentioned X-rays of Kuhl's lumbar spine, "none of which show any… neurological involvement." Dr. Brahms concluded that Kuhl "does not meet the listings" and "is capable of performing light duty." He recommended that she avoid repetitive lifting below waist level, stairs, ladders, ropes, scaffolds, heavy machinery, and repetitive overhead work above shoulder level.

### C. Opinion of Dr. Wheeler

The ALJ also relied on the report of the consultative physician, Dr. Eden Wheeler, who performed Kuhl's 2006 disability evaluation. After examining Kuhl, Dr. Wheeler reported that Kuhl exhibited "[p]rofound self-limitation and overreaction behavior exhibited throughout" the examination as well as "poor effort" on reflex testing and "inconsistency on repeat efforts." The consultative physician also reported that Kuhl exhibited "subjective tenderness" and "subjective pain and 'stiffness.'" Regarding Kuhl's work ability, the consultative physician stated that Kuhl could carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk for 15 minutes each hour in an eight-hour day; and could sit for two hours at a time with 15 minute breaks in an eight hour day.

### D. Opinion of the Vocational Expert

At the hearing, the ALJ presented a hypothetical to vocational expert Barbara Myers regarding the work capacity of someone with the capacity and restrictions which the ALJ found credible. Although the vocational expert determined that such a hypothetical person would be unable to work as a mailing machine operator, Kuhl's past profession, the expert did state that such a person could work as a folding machine operator, a small parts assembler, or a production assembler. The ALJ relied on this determination to find that jobs existed which Kuhl could perform.

The ALJ also posed a second hypothetical, in which he inquired about the work capacity of an individual who could lift and carry five pounds occasionally; could stand and walk for only ten minutes at a time for one hour in an eight hour day; could sit for thirty minutes at a time for four hours in an eight hour day; and who could not stoop, kneel, crouch, crawl, hard grasp, work from heights, or perform overhead work or fine manipulation with her hands. In response to this hypothetical, Ms. Myers testified that such a person would be unable to perform any work in the national economy.

### E. Records of Dr. Chandra, Kuhl's Treating Physician

From 2000, shortly after her car accident, to 2008, Kuhl's primary physician was Dr. Ram Chandra. Dr. Chandra's notes indicate that he examined Kuhl more than fourteen times in those years for back pain, neck pain, migraines, thyroid problems, and joint and muscle pain. For instance, in 2006 he summarized her condition as: "medical diagnoses include: Near syncope, alopecia, chest pain, hypertension, hyperlipidemia, chronic lumbar pain, migraine headaches, and history of thyroid nodules. Most recently, she has been in the office multiple times for severe lumbar pain." Dr. Chandra also

referred Kuhl to various specialists for testing during this period. He recommended her for lumbar spine MRIs in 2000 and 2006. In 2000, Kuhl's MRI revealed some evidence of degenerative disc disease, including mild disc bulging, disc desiccation, and a transitional type vertebra, but with no significant narrowing of the spinal canal or neural foramina. In 2006, the MRIs found no significant central canal or neural foraminal stenosis or problems with the cervical spine, but indicated that Kuhl's spine had experienced increased disc desiccation, broad based disc bulging, mild disc space narrowing, and right lateral disc protrusion resulting in mild right neural foraminal stenosis. In 2008, after Kuhl presented with elbow, hand, and wrist pain, Dr. Chandra referred Kuhl to rheumatologist Dr. Thomas Scott. Dr. Scott diagnosed Kuhl with an incomplete presentation of CREST syndrome, including Raynaud's phenomenon, esophageal dysmotility, and facial telangiectasias, as well as fibromyalgia. Dr. Scott stated that some indicators of CREST syndrome were not present – namely sclerodactyly, vasospasm, hair loss, and dysphagia – but noted that Kuhl reported musculoskeletal pain and fatigue and polyarthralgia.

In addition to Dr. Chandra's notes, the record also contains the medical reports kept by three nurses who saw Kuhl at the LHRC Rural Health Clinics from 2004-08. The record indicates that Kuhl was seen between two and four times a year during that period for back pain with radiculopathy, chronic migraines, hypothyroidism, type 2 diabetes, fatigue, radiculopathy in the legs, numb feet, and hand, arm, and neck pain. On these visits, when asked to rate the severity of her pain out of 10, Kuhl regularly gave a number between 3 and 9. Several entries note that Kuhl was "wincing in positioning herself in

5

the office today," "positioning herself in chair, exam table, standing up around room, pacing during entire examination to make herself more comfortable," although other entries note that she reported decreased pain with medication. Kuhl was diagnosed in these records as having low back pain with radiculopathy, migraines, fatigue, hypothyroidism, chronic pain, and type 2 diabetes. Kuhl continued to seek treatment for these conditions even after her disability benefits were revoked.

### F. Kuhl's Testimony and Affidavits

Kuhl testified at the hearing regarding her chronic back pain; chronic migraines; soreness in her hips and knees; finger and hand pain and spasms; difficulty sitting, standing, or walking for long periods; and sudden falls. She testified that even basic activities of daily life, such as buttoning her shirt, showering, or getting the mail, are difficult for her because of her condition. This testimony was supported by that of her husband, Norman Kuhl, who testified to Kuhl's sudden falls and sleeping spells. He stated that Kuhl can perform daily life activities only infrequently and with limitations, such as driving for no more than 20 minutes at a time and walking through the grocery aisles only with the support of the cart. Kuhl and her husband also testified that Kuhl depends on her husband and children to clean, cook, and shop.

In her affidavits, Kuhl offers several reasons why she did not engage in consistent treatment for her ailments. The record contains documentation regarding Kuhl's difficulties paying for health insurance and prescription medication. In May 2006, Dr. Chandra wrote that Kuhl "is still having headaches and a lot of depression and anxiety. Apparently, she is going to be losing her house...." One nurse at LRHC, Tanetta Main,

6

noted that Kuhl "has recently lost her secondary insurance coverage which covered her prescriptions. She states that it is a financial struggle to afford her prescriptions, but she continues to take her Synthroid, Topomax, Metformin." The record indicates that Kuhl attempted to obtain her prescription medication by asking her doctors for samples, but faced difficulty in getting a regular supply. Although the treating physicians appear to have dispensed samples to Kuhl when they could, samples were not always available; Nurse Main wrote that she "[i]nstructed patient, that if she runs out of medications to notify the office and we will see what samples are available to her while she is out of her prescription coverage." Kuhl faced similar financial barriers to treatment. Nurse Main noted, "I sent her to Dr. Park for evaluation, however she did not go, because she lost her insurance and is on Medicare only." Several times, Kuhl "was instructed that she needs to go to Neurosurgery and seriously consider surgical correction for her low back pain," yet Kuhl did not pursue surgery. Additionally, the records indicate that even after the ALJ's decision, Kuhl continued to request samples from her treating physician and to express concern about her financial difficulties affecting her ability to maintain regular treatment.[1]

---

[1] *See* TR-516 (04/07/2009) (Records of Dr. Aslami) ("she has just recently lost her insurance and she has plan Medicare with no prescription coverage"); TR-512 (08/11/2009) ("She just recently lost her house and as a result, she ended up moving from her house to an apartment… She is also on disability and since her disability went into review, they ceased payment and as a result has caused severe financial strain and anxiety, depression on patient and she has not been able to afford her treatment for Cymbalta for the past month or so and she has not been taking her medication. She is crying and having significant amount of anxiety, panic and depression symptoms."); TR-510 (12/07/2009) ("She still has no insurance and she is being evaluated for disability. She is mainly relying on samples from us… I explained to patient that I do not have any samples of Cymbalta [depression med] and the Court can not sustain her on samples [sic].").

7

Kuhl also offered an additional reason in support of her wariness to pursue surgery in spite of her doctor's repeated recommendations; she testified that she developed a fear of surgery after a previous surgery went awry when doctors removed the wrong portion of her thyroid. She explained, "[H]e [her physician] has referred me to a back doctor… But I'm just scared of going to one… I had a cancerous tumor on my thyroid… And when [] in to had it removed and they took the wrong one [sic]. Then I had to go back and have the right one, the correct on removed [sic], and I just am scared to go to the doctor… I just don't want them to mess anything else up. I mean… It's hard to get that trust back."[2]

Furthermore, Kuhl testified, and her medical records reveal, that she is highly sensitive to medication. For instance, the Ultram and Robaxin prescribed for her lower back "make her so sleepy that she can barely function." Similarly, Dr. Chandra recorded that "We had her on Altocor on the past but caused significant near syncopal episodes [sic]." Other records indicate that Kuhl reported increased episodes of vomiting and diarrhea from around the time she began taking Metformin. Kuhl testified at the hearing, "He [the doctor] tried to give me more pain medicine. I cannot take the pain medicine that they give me. It makes me so sleepy and drowsy. It makes me upset to my stomach and nauseous." Regarding her migraines, she explained, "They gave me Imitrex, and things like that, and it just made me like black out. So I don't take any medication for them [the migraines]. I just, I use ice packs." At one point Kuhl told the nurse that the pain medication for her back made her so sleepy that "[s]he waits until her pain is too

---

[2] TR-535-56.

severe to continue working and then takes her pain medication and then she will need to take a nap shortly after." Yet the record also indicates that Kuhl's pain was lessened with medication.[3]

Finally, the record includes affidavits from Kuhl in which she states her frustration at her condition: "I cannot get a job because I am in frequent pain… I am not able to be the mother I need to be. I am not the wife I should be… I am so tired of feeling this way…. I feel helpless in providing for my family."

## II. Decision

### A. Legal Standard

Disability benefits are subject to periodic review at least once every three years. 42 U.S.C.A. § 421(i)(1). In deciding whether a recipient's disability benefits should continue, the Social Security Administration (SSA) conducts a multi-step review, asking, *inter alia*, 1) whether the claimant is engaged in substantial gainful activity; 2) if not, whether the claimant's disability meets the requisite level of severity; 3) if the disability is not sufficiently severe, whether there has been any medical improvement, and 4) if so, whether the medical improvement is related to the claimant's ability to work, based on the claimant's Residual Functional Capacity (RFC). 20 C.F.R. § 404.1594(f); *see also Dixon v. Barnhart*, 324 F.3d 997, 1000-01 (8th Cir. 2003). Medical improvement is defined as any decrease in the medical severity of an individual's impairments present at

---

[3] TR-413 (09/15/2006) (Records of LRHC) ("Patient says pain improved in lower back with decreased radiculopathy, endocrinologist increased Synthroid dosage, pain at 5"); TR-403 (08/15/2008) ("Recently diagnosed with scleroderma by dermatologist and placed on Procardia which seems to be helping very well with Raynaud's disease."); TR-411 (11/09/2006) ("Patient reports her back pain is resolved when taking the Ultram and Robaxin.").

the time of the most recent favorable decision that the complainant was disabled. A determination that medical severity has decreased must be based on improvement in the complainant's symptoms, diagnostic signs, and/or laboratory findings associated with the claimant's impairments. 20 C.F.R. § 404.152, § 404.1594(b)(1).

On review, the role of the Court is to determine whether the Commissioner's decision to terminate benefits on the basis of medical improvement "is supported by substantial evidence in the record as a whole." *Muncy v. Apfel*, 247 F.3d 728, 730 (8th Cir. 2001); *see also Dixon*, 324 F.3d at 1000; *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence" is less than a preponderance, but must be sufficient for a reasonable mind to find it adequate to support the conclusion. *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004); *see also Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). The Court must consider evidence that detracts from as well as supports the ALJ's decision. *Black v. Apfel*, 143 F.3d 383, 385 (8th Cir. 1998). If the substantial evidence makes it equally possible to form two opposite conclusions, one of which accords with the ALJ's findings, the Court is obligated to affirm the ALJ's decision. *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996); *see also Finch*, 547 F.3d at 935.

### B. Whether the ALJ Properly Considered the Medical Evidence

The ALJ relies on the testimony of Dr. Brahms, who reviewed Kuhl's medical record but did not examine her, and Dr. Wheeler, who examined Kuhl once for her 2006 Disability Evaluation. In so doing, he fails to give controlling weight to the records of Kuhl's treating physician, Dr. Chandra, and the three nurses at the LHRC.

10

In determinations of disability, the treating physician's opinion is given "controlling weight." *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000); *see also Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Dr. Chandra and the nurses at LHRC saw Kuhl twenty times between 2000 and 2008. Opinions of a treating physician may be disregarded only where they are inconsistent or "where other medical assessments are supported by better or more thorough medical evidence." *Prosch,* 201 F.3d at 1013 (quoting *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997)) (internal quotes omitted). Thus, absent substantial evidence indicating otherwise, the opinion of Dr. Chandra and the nurses should be given controlling weight in the ALJ's decision.

Strikingly, the ALJ refers not once to Dr. Chandra in his nine page decision. Instead, he repeatedly references Dr. Brahms, who never examined Kuhl in person, and Dr. Wheeler, who examined Kuhl only once. Yet the opinion of a consultative physician who examines a claimant only once "is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion." *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001). The records of Dr. Chandra and the nurses regarding Kuhl's condition are remarkably consistent. The opinions of Dr. Brahms and Dr. Wheeler, as non-treating physicians, cannot supersede the opinions of Dr. Chandra and the nurses, considering the evidence as a whole. Further, even when an ALJ determines that inconsistency or superseding medical assessments exist, he "must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch*, 201 F.3d at 1013 (quoting 20 C.F.R § 404.1527(d)(2)). However,

11

the ALJ did not support his decision to disregard the records of Kuhl's treating sources with "good reasons," as required, or indeed any reason at all.

The opinions of Dr. Chandra and the nurses are strongly supported by the medical record. As discussed above, these treating sources found that Kuhl suffered from chronic back pain, chronic migraines, hypothyroidism, type 2 diabetes, fatigue, radiculopathy in the legs, fibromyalgia, and incomplete CREST syndrome. The MRIs evidence gradually worsening disc degenerative disease between 2000 and 2008, which is consistent with Kuhl's increasing visits for back pain from 2004-08.[4]

Records of medical examinations that occurred after the date of the ALJ's examination may also be taken into consideration where they offer evidence of an ongoing condition. *Cunningham v. Apfel*, 222 F.3d 496, 499 n.3 (8th Cir. 2000); *see also Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995). A review of Kuhl's medical records post the ALJ's decision in 2009 adds additional support for her treating physician's diagnosis.[5]

---

[4] Kuhl underwent additional MRIs of her lumbar region in 2009 and 2010. The MRI in June 2009 showed "broad based disc bulge involving L5, S1 with mild to moderate left lateral recess stenosis" consistent with Kuhl's "longstanding history of degenerative disc disease," as well as a transitional S1 segment. TR-505. The most recent MRI, in September 2010, noted degenerative changes in the lumbar area including mild modic type II endplate reactive changes at the L5-S1 level, disc desiccation at L5-S1 level, mild to moderate right neural foraminal stenosis, and minimal central canal stenosis. TR-460.

[5] Beginning in 2009, Kuhl began to see Dr. Ahmad Aslami, and proceeded to undergo twelve examinations in 19 months for various complaints, including diabetes, hypothyroidism, fibromyalgia, Raynaud's syndrome, scleroderma, migraines, anxiety, and depression. Dr. Aslami's records indicate that regular musculoskeletal examinations of Kuhl consistently revealed tenderness in her lower back "consistent with chronic fibromyalgia." TR-517 (Records of Dr. Aslami) (03/26/2009); *see also* TR-514 (05/29/2009); TR-513 (06/04/2009); TR-505 (08/16/2010); TR-506 (09/09/2010). Dr. Aslami also notes that Kuhl's main concern was

12

Yet despite this comprehensive record, the ALJ failed to give controlling weight to the opinions of Dr. Chandra or the nurses. Instead, the ALJ's decision relies primarily on the testimony of Dr. Malcolm Brahms, who never examined Kuhl but only reviewed her record. Dr. Brahms discusses neither Kuhl's chronic back pain nor her migraines in any detail, but attributes her degenerative disc disease to her "large body structure," without a careful analysis of the records. Yet the ALJ's decision relies on Dr. Brahms' testimony to support the conclusion that Kuhl's medical condition had "significantly improved." The ALJ furthermore made this determination without addressing the inconsistency between Dr. Brahms' assessment and the well-documented records of Kuhl's treating sources, which indicate that her condition was not improving, and, with regards to her lumbar spine MRIs, was in fact slowly deteriorating. The Court, therefore, finds that the ALJ's reliance on Dr. Brahms' testimony in place of the records of Kuhl's treating sources was unsupported by the record as a whole.

### C.     Whether the ALJ Properly Assessed Plaintiff's Credibility

Kuhl also argues that the ALJ erred in assessing her credibility. The ALJ found that Kuhl's subjective claims of pain were not credible because Kuhl took pain medication only irregularly and engaged in only sporadic treatment. Whereas noncompliance with a treating physician's recommended treatment may be grounds for

---

"chronic recurrent pain involving her neck, back, arms, [and] legs related to her fibromyalgia." TR-517 (03/26/2009). Dr. Aslami also documented Kuhl's visits for migraines that lasted more than two days on two occasions. TR-516 (4/07/2009); TR-514 (5/29/2009). He furthermore wrote that Kuhl experienced "multiple falls," TR-514 (05/29/2009); TR-513 (06/04/2009), and regularly complained of "chronic low back pain." TR-506 (09/09/2010); TR-505 (08/16/2010); TR-513 (06/04/2009); TR-514 (05/29/2009); TR-517 (03/26/2009).

13

denying an application for benefits, this is not so where noncompliance is with good reason. *Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004); *Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003). The Court finds that the substantial evidence of Kuhl's financial difficulties, sensitivity to medication, and fear of surgery calls into question the ALJ's reliance on her failure to fill prescriptions and obtain surgery as indicative of Kuhl's lack of pain.

Kuhl has offered sufficient documentation that she has periodically been without health insurance and could not afford her prescriptions. "Clearly, if the claimant is unable to follow a prescribed regimen of medication and therapy to combat her disabilities because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits." *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992); *Tome v. Schweiker*, 724 F.2d 711, 713-14 (8th Cir. 1984). The record also indicates that Kuhl's pain was lessened with medication, which undermines the ALJ's assumption that Kuhl did not take medication because she did not need it. Finally, Kuhl has also offered documentation of her fear of surgery resulting from previous thyroid surgery gone awry. The ALJ's conclusion that Kuhl's condition had not improved because she did not regularly take medication or actively pursue treatment is not supported by the record as a whole.

The ALJ also bases its credibility assessment on the report of Dr. Wheeler, the consultative physician who examined Kuhl once for her 2006 Disability Evaluation. Dr. Wheeler assessed Kuhl's behavior as overreactive, self-limiting, and subjective. However, the records of Kuhl's treating physician provide objective evidence of Kuhl's

14

complaints, with no indication that these treating sources considered Kuhl to be overreacting or self-limiting. In fact, Dr. Chandra referred Kuhl to numerous specialists for examination and recommended MRIs, lab tests, and ultrasounds. Furthermore, the records from the health clinic describe Kuhl in very different terms than those used by Dr. Wheeler; on several occasions the nurses there note that Kuhl "is pleasant and neat in appearance," "answers questions appropriately," and is "alert and oriented." Given the inconsistency between the records of Kuhl's treating sources and the consultative physician, the treating sources are entitled to controlling weight absent some specific explanation why they are being disregarded.

Furthermore, the ALJ's reliance on Dr. Wheeler's conclusion that Kuhl's pain was "subjective" is largely unexplained. "In analyzing a claimant's subjective complaints of pain, an ALJ must examine: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black*, 143 F.3d at 386 (referencing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)); *see also Finch*, 547 F.3d at 935. Although "the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility," these considerations must be taken into account. *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007). Allegations of subjective pain must be seriously considered by the ALJ, *Polaski*, 739 F.2d at 1322; *Karlix v. Barnhart*, 457 F.3d 742, 748 (8th Cir. 2006), and may be discounted "only if there are inconsistencies in the record as a whole." *Finch*, 547 F.3d at 935 (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir.1997)). An ALJ who

15

Case 4:12-cv-00091-NKL   Document 14   Filed 09/19/12   Page 15 of 18

decides to discredit a complainant's subjective testimony must do so explicitly and for good reason. *Karlix*, 457 F.3d at 748.

Kuhl's subjective claims of pain are supported by the medical record, which documents a long history of back pain and migraines, with indications that the degenerative disc disease from which Kuhl suffers has become more serious with time. Kuhl testified that even basic activities of daily life, such as buttoning her shirt, showering, or getting the mail, are difficult for her because of her condition. She reports being in constant pain, and the medical records of her treating physician consistently refer to "chronic back pain" and "chronic migraines." As discussed *supra*, Kuhl's financial difficulties and sensitivity to medication also made effective management of the pain difficult. The ALJ has offered no reasons to discredit her objectively supported claims of pain apart from Kuhl's inconsistency in medication and treatment and the consultative physician's assessment. Based on the above analysis, the court finds that these reasons are not sufficient to justify disregarding Kuhl's testimony and the extensive support of the medical record.

The ALJ also discounted Kuhl's complaints about pain because of her daily activities. The ALJ concludes that because Kuhl can perform some daily life activities, she is capable of some types of gainful work. However, the ability to engage in daily life activities, at a reduced pace and within a confined scope, does not guarantee the ability to perform a full-time job in a competitive atmosphere. "As we have repeatedly held, the inquiry must focus on the claimant's ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people

16

work in the real world." *Tang v. Apfel*, 205 F.3d 1084, 1086 (8th Cir. 2000); *see also Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003) ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity."). *C.f. Young*, 221 F.3d at 1069 (finding that claimant's ability to perform daily work in the national economy was supported by her statement that she "cooked, cleaned, did laundry, shopped, studied Russian, and exercised, and … functioned as the primary caretaker for her home and two small children."). The testimony of Kuhl and her husband indicates that Kuhl can perform these activities only infrequently and with limitations. There is insufficient basis in the record to support the ALJ's conclusion that because Kuhl can perform limited daily life activities, her testimony about her pain is not credible.

### D. Whether the ALJ Properly Assessed Plaintiff's RFC

Because the ALJ erred in assessing Kuhl's credibility and did not give proper weight to her treating sources, the Court finds that the ALJ's RFC is not supported by the evidence, given the totality of the record

## III. Conclusion

Where evidence of disability is overwhelming, the court should reverse, rather than remand. *Bryant v. Bowen*, 882 F.2d 1331, 1334 (8th Cir. 1989); *see also Cunningham*, 222 F.3d at 503 (where the record contains substantial evidence supporting a finding of disability and a remand would unnecessarily delay benefits, reversal is appropriate).

Accordingly, the Court REVERSES the finding of the ALJ that Kuhl's condition had improved and she was no longer disabled. The case is REMANDED for a determination of benefits consistent with this opinion.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: September 19, 2012  
Jefferson City, Missouri